UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JACKIE NARDELLA,

    Plaintiff,

v.                                Case No. 8:19-cv-1152-T-33JSS

ATLANTIC TNG, LLC, and
MEGAN KITCHNER,

    Defendants.
_____/

**ORDER**

    This matter comes before the Court pursuant to Defendants Atlantic TNG, LLC and Megan Kitchner's Motion for Summary Judgment (Doc. # 54), filed on April 7, 2020. Plaintiff Jackie Nardella responded on April 22, 2020. (Doc. # 59). Defendants replied on May 1, 2020. (Doc. # 61). For the reasons that follow, the Motion is granted in part and denied in part.

**I.**    **Background**

    **A.**   **Nardella's Pay and Medical Leave**

    Atlantic is "a manufacturing company that provides precast concrete storm and sanitary products." (Doc. # 54-2 at 1). Kitchner is Atlantic's owner and general manager. (Id.).

1

Nardella worked for Atlantic from January 2016 to April 2, 2019. (Id. at 1). From January 2018 until the end of her employment, Nardella worked as Atlantic's Human Resources and Compliance Manager. (Id.). In that position, Nardella "exercised discretion with respect to compliance with various laws, and [she] could terminate employees or recommend termination." (Id. at 3). For example, in November 2018, Nardella prepared a report recommending that an Atlantic employee be terminated because he discriminated against and harassed subordinates. (Doc. # 54-4).

Initially, Nardella was paid on an hourly basis. (Doc. # 54-2 at 2). Then, from October 30, 2017 until October 12, 2018, Nardella received a salary of $50,000.08 per year ($1,923.08 every two weeks) as an exempt employee. (Id.). According to Kitchner, Nardella "was made a salaried employee at her request." (Id. at 3). Kitchner also asserts that, "[d]uring the time in which she was paid a salary, no deductions were made from [Nardella's] salary. On a few occasions she was charged personal time off ('PTO') but her salary was paid in full in every pay period that occurred while she was a salaried employee." (Id.). The payroll records presented by Defendants support Kitchner's assertion. (Doc. # 54-6 at 50-75).

Sometime in 2017, Nardella "suffered from a serious health condition [that] necessitated [Family Medical Leave Act (FMLA)] time away from work due to complications from Lupus." (Doc. # 54-32 at 19). She "requested FMLA paperwork from [] Kitchner but she refused to provide [Nardella] with such documents, stating that FMLA wasn't necessary." (Id.). Later, in November 2017 through May 2018, Nardella's "son fell very ill due to a serious medical condition" and "required recurring hospital visits and treatments that required [Nardella] to miss partial and full days from work to attend to same." (Id.). Again, Nardella asked Kitchner to "provide her with FMLA paperwork, but her request was refused; instead, [she] was instructed that she was not to apply for FMLA." (Id.). "Kitchner never proffered information or FMLA paperwork despite [Nardella's] several requests for same." (Doc. # 59-2 at 4).

But Nardella also admitted that she "was never denied a request for leave or time off from work." (Doc. # 54-32 at 18). Additionally, Nardella's payroll records do not reflect any deductions on account of absences from work caused by her or her son's medical conditions, besides full days taken off with PTO. (Doc. # 54-6). She was paid her full salary in every pay period in which she was paid a salary. (Id.).

3

Still, Nardella claims that "Kitchner began to voice her displeasure with [Nardella's] attendance due to her son's medical issues and attending time away from work, and instructed [Nardella] that her attendance was problematic." (Doc. # 54-32 at 19; Doc. # 54-14 at 113:3-114:6; Doc. # 59-2 at 3). These comments had a "chilling effect" on Nardella by discouraging her from taking more FMLA leave and "forcing her to work on occasions where, had she been FMLA protected and notified, she would have taken more and necessary time away from work as protected FMLA leave." (Doc. # 54-32 at 19; Doc. # 59-2 at 3).

In Nardella's words, "It's not that I wasn't allowed to take [FMLA leave]. It's that she discouraged me from taking it. I was afraid to take it because of her threats and her publicly embarrassing me in front of my co-workers and, you know, just making it unpleasant for me if I needed to take time." (Doc. # 54-31 at 26:16-25). Additionally, according to Nardella, Kitchner made threats about Nardella's job when Nardella did take leave:

> I would, you know, have to leave work early, and she would tell me that she was going to take me off of salary and that it's a privilege to be on salary and because I couldn't stay for another hour she was going to take me off, or she would, like, make fun of me in front of my co-workers or tell me that

4

> if this continues she's going to have to re-
> evaluate my position in the company.

(Id. at 28:9-16).

As of the pay period beginning on October 14, 2018, while she was Human Resources and Compliance Manager, Nardella's pay was changed back to hourly, although her duties did not change. (Doc. # 54-2 at 2-3). In an email from January 2019 and at one point in her deposition, Nardella acknowledged that Kitchner informed her of the change on October 30, 2018. (Doc. # 54-14 at 127:8-128:8; Doc. # 54-42).

"[H]er hourly rate of pay was set at $25.00 per hour, which would have resulted in an annual income of $52,000.00 if she worked 40 hours in each week." (Doc. # 54-2 at 2-3). The payroll records produced by Atlantic and Kitchner show that Nardella's gross pay exceeded $1,923.08 in every pay period after she was returned to hourly. (Doc. # 54-6 at 76-90). Indeed, during her second deposition, Nardella admitted that she made more money in every pay period after she was transitioned back to hourly. (Doc. # 54-31 at 65:11-19).

Kitchner avers that Nardella was not changed to an hourly employee "as a demotion or punishment." (Doc. # 54-2 at 3). But Nardella insists that her pay was changed to hourly as retaliation for her use or attempted use of FMLA leave. (Doc.

# 54-32 at 20; Doc. # 54-31 at 71:12-16). Specifically, in the January 2019 email, Nardella states that Kitchner "demoted" her to hourly pay because Nardella "had abused [her] privileges as an exempt employee." (Doc. # 54-42). Kitchner demoted her on October 30 — the day after Nardella took paid time off, but not FMLA leave, because her granddaughter was born. (Id.; Doc. # 54-14 at 127:8-128:11).

Nardella avers that the change to hourly pay "caused a material alteration to the terms and conditions of [her] employment" because she "was no longer a salaried, exempt employee, but relegated back to an hourly, non-exempt employee, [with] less flexibility with hours, [and was] required to clock in and out even on days working out of the office or during after work hours." (Doc. # 59-2 at 4).

Hourly-paid employees, like Nardella, entered their own time into a program named iSolved, which was provided by a third-party payroll company, iBusiness Solutions ("iBS"). (Doc. # 54-2 at 3; Doc. # 54-5 at 1-4). As Human Resources and Compliance Manager, Nardella reviewed and corrected the time records of Atlantic employees and then submitted that data to iBS, which would then process the company's payroll based on that data. (Id. at 4-5). Nardella was able to do this because she had administrator access to iSolved, which

6

allowed her to make changes to employees' time entries, rates of pay, deductions, and withholdings to be made from employee pay checks. (Id. at 2-4). Kitchner avers that "[a]lthough [she] could have obtained administrator's access to the payroll system, [she] did not have it before April 2, 2019," and "did not even have a password" at that time. (Doc. # 54-2 at 4).

According to the affidavit of David Yohn, iBS's co-founder, once these time records were submitted by Atlantic to iBS, iBS would "hardcode" the data — meaning no one at Atlantic could make any additional changes to the data. (Doc. # 54-5 at 3). After hardcoding, iBS "can only change [the data] by changing the program," and Yohn avers that "iBS has made no changes to the data on which the statements of earnings [submitted as evidence] were created." (Id.).

In contrast to the affidavits provided by Defendants, Nardella avers that iBS "never hard-coded its data so all upper management employees had access to the timekeeping system and through this, could alter or modify data therein to manipulate time records and payroll for which [Nardella] was undercompensated and subject to unlawful deductions." (Doc. # 59-2 at 2).

7

According to Defendants, Nardella was paid for all the hours she entered in the iSolved system. (Doc. # 54-2 at 6-7). The payroll records reflect that Nardella was paid significant numbers of overtime hours while she was an hourly employee and that she was paid for every hour listed in the payroll records. (Doc. # 54-6).

But Nardella avers in her affidavit that Atlantic and Kitchner "failed to compensate [her] for all overtime hours worked in violation of the FLSA off-the-clock work outside the office or attending after-hours work-related matters at the direction of [] Kitchner." (Doc. # 59-2 at 2). She further avers she "worked an average of seven and one-half (7.5) overtime hours per week [] as an hourly, non-exempt employee from January 4, 2016, through October 29, 2017, and again, from October 13, 2018, through April 2, 2019, for which [she] was deprived overtime compensation." (Id.). According to Nardella, Atlantic and Kitchner "knew that [she] was working overtime hours." (Id.). Nardella testified that she frequently worked from home but was not paid for these hours because she was unable to clock in within the payroll system there. (Doc. # 54-31 at 36:23-37:4).

Furthermore, Nardella avers that Atlantic and Kitchner "unlawfully made deductions to [her] compensation while [she]

was a salaried, exempt employee." (Doc. # 59-2 at 2). In her response, she identifies eight weeks in which such alleged unlawful deductions were supposedly taken: "the weeks of June 1, 2018, June 29, 2018, February 23, 2018, March 9, 2018, April 6, 2018, May 18, 2018, January 26, 2018, and November 3, 2017." (Doc. # 59 at 15 n.3). The record for June 29, 2018, shows an adjustment of $418.89 made to the Nardella's net pay because in the three pay periods occurring before and on that date, Nardella did not deduct from her own paycheck the employees' share of Social Security or Medicare payments. (Doc. # 54-21 at 9). Most other weeks reflect a reduction in net pay because of a full day or two days of PTO being used. (Id. at 7-9). Finally, the pay period with a pay date of November 3, 2017, was Nardella's last work week as an hourly employee (for the first time), so it does not reflect a deduction in her salary. (Id. at 7; Doc. # 54-6 at 49).

**B.   Workers' Compensation Audit and Nardella's Termination**

Nardella and Kitchner also had a disagreement in 2019 concerning the annual workers' compensation audit, required by Florida Statute § 440.381 and to be performed by Atlantic's workers' compensation insurance company. The parties agree this annual audit was required "to include all records showing

compensation paid to any employee or subcontractor of the employer and evidence of workers' compensation coverage maintained by any subcontractors." (Doc. # 54 at 4; Doc. # 54-43). The parties also agree that "the workers' compensation law provides that an employer engaged in construction provide and pay for workers' compensation coverage for all employees of a subcontractor unless the subcontractor provides that coverage." (Doc. # 54 at 4-5)(citing Fla. Stat. § 440.10).

On March 29, 2019, Nardella emailed Kitchner, expressing her concern that Atlantic had violated a Florida rule regarding the maintenance and production of records by employers, Rule 69L-6.015 of the Florida Administrative Code. (Doc. # 54-26 at 1-4). Specifically, Nardella told Kitchner that if she "chose not to comply with" Atlantic's obligation to obtain and maintain "records of 10-99s and [workers' compensation] COIs [certificates of insurance]/Exemptions," she was "creating liability exposure." (Id. at 1). The email goes on to present the text of the rule. (Id. at 2-4). Additionally, Nardella asked that Kitchner "shift the [workers' compensation] auditing responsibilities to [the person responsible for maintaining these records], which is currently Stephanie [Wecht, Atlantic's purchaser]." (Id. at

1-2). Nardella stated that Wecht "should continue to work with Jamie [Dunnam] in executing this year's audit." (Id. at 2). Dunnam is the co-founder of iBS, which, in addition to providing Atlantic payroll services, also is "the agent on Atlantic's workers' compensation policy" and "assists the company with inspections, premium audits and class code verifications related to workers' compensation coverage." (Doc. # 54-8 at 1-2).

Finally, Nardella's March 29 email "laid out what transpired," leading to her email. In short, the email recounts that Nardella was responsible for workers' compensation audits, but Kitchner had assigned the purchaser, Wecht, to obtain and maintain the workers' compensation compliance documents (such as COIs). (Id. at 2). Nardella asked Wecht for compliant workers' compensation documents but Wecht was "non-responsive," so Nardella complained to Kitchner. (Id.). Kitchner then spoke to Wecht, who explained that "these documents are not required." (Id.). In light of this confusion, Kitchner asked a third party — Dunnam — to speak to Wecht about what is required for workers' compensation compliance. (Id.). Based on what Dunnam told Wecht, Wecht concluded that Nardella was wrong about what records needed to be maintained for compliance. (Id.).

In his affidavit, Dunnam recounted his exchange with Wecht. (Doc. # 54-8 at 6). During that conversation, Wecht informed Dunnam that Nardella had told her "to obtain [COIs] for all vendors (independent contractors) that had performed work on Atlantic property." (Id.). "Wecht asked [Dunnam] if she was properly preparing for the audit by only obtaining [COIs] for subcontractors and not for vendors." (Id.). Dunnam told her she was correct that "[c]ertificates of workers' compensation insurance are not required for vendors." (Id.).

This is because "[n]ot every person who performs work for Atlantic is a subcontractor for workers' compensation purposes" — it only includes "one who has been subcontracted by the employer to perform work that is required from the employer under its contract with the employer's customer." (Id. at 4). Likewise, not every independent contractor qualifies as an "employee" for workers' compensation purposes. (Id.). Only independent contractors "engaged in construction" are employees; independent contractors "not engaged in the construction industry" are not employees. (Id.). Thus, while "Atlantic routinely requires COIs from any person or business paid for services" out of caution, "[n]ot all of these persons or businesses are subcontractors and therefore not all of the COIs are required or needed for the

12

workers' compensation audit." (Id. at 5). Indeed, in her letter listing the documents required for the audit, the auditor only requested to see COIs for subcontractors — not all of Atlantic's vendors. (Doc. # 54-9).

Wecht also confirmed that Dunnam advised her that only COIs for subcontractors were required for the audit. (Doc. # 54-47 at 63:11-23). Nardella was upset when she learned about this conversation. (Id. at 63:24-64:5). But Kitchner agreed with Wecht and Dunnam, and told Nardella that workers' compensation documentation regarding "non-subcontractor vendors" was "not required for the audit." (Id. at 64:6-18).

Nevertheless, according to Nardella, her March 29 email pointed out to Defendants that their "recordkeeping and failure to maintain proper Certificates of Insurance ['COIs'], exemptions or 1099s for the workers' compensation audit" was "illegal." (Doc. # 59-2 at 4). During her first deposition, Nardella testified that Wecht "was not retaining" COIs, 1099 forms, and exemptions for "any of [Atlantic's] subcontractors [and] workers." (Doc. # 54-14 at 137:6-24). But, when asked to name the subcontractors and workers for whom these records were not obtained, Nardella said that she did not "have that information in front of [her]." (Id. at 137:22-24). In contrast to this testimony, Wecht testified

13

that she did obtain all subcontractor COIs to give to the auditor. (Doc. # 54-48 at 56:8-57:24, 59:9-16).

Nardella averred in her affidavit that "Defendants were intentionally attempting to illegally underreport and defraud Defendants' workers' compensation insurance carrier by manufacturing and withholding information to induce lower insurance premiums owed by Defendants." (Doc. # 59-2 at 5). Yet, in her second deposition, Nardella acknowledged that, if Atlantic did not have COIs for its subcontractors, Atlantic's workers' compensation premium would go up — not down:

> Q: Okay. So, tell me how it would be fraudulent for Atlantic not to have a certificate of insurance for a subcontractor.
>
> A. Because we couldn't prove that they had insurance. We don't have a waiver. We don't have a certificate. So, we would need to be paying their work comp rate.
>
> Q. We'd pay more?
>
> A. Right. You're underreporting, essentially.

(Doc. # 54-31 at 82:12-20).

Dunnam's affidavit confirms this. "If a subcontractor did work for Atlantic during the audit year and the subcontractor did not provide workers' compensation, that subcontractor's employees would have been covered under Atlantic's workers' compensation policy." (Doc. # 54-8 at 4). Thus, "not having a COI for a subcontractor is against

Atlantic's interests" because "the audit would result in a higher premium being paid retroactively by Atlantic." (Id.).

Kitchner responded to Nardella's March 29 email and ordered Nardella to schedule the audit. (Doc. # 54-26 at 1). On April 2, 2019, at 9:33 am, Nardella emailed Kitchner the following:

> The audit is scheduled for this Thursday, as requested. I will not be participating in the audit. I reached out to Rebecca as a resource of accountability and guidance regarding this situation and she suggested that you and I have a constructive conversation about it. Would you be willing to allow Rebecca to facilitate that conversation with us?

(Id.).

Then, at 1:47 pm on April 2, Nardella emailed the auditor, Carol Dettman-Smith, accepting the auditor's offer to schedule Atlantic's audit for April 4 and attaching documentation needed for the audit, including COIs for subcontractors. (Doc. # 54-13; Doc. # 54-31 at 93:9-19).

Kitchner fired Nardella at some point on that same day. (Doc. # 59-2 at 5).

Nardella initiated this action against Atlantic and Kitchner on May 13, 2019. (Doc. # 1). Atlantic and Kitchner filed their answer on June 12, 2019. (Doc. # 14). The case then proceeded through discovery.

Atlantic and Kitchner now seek entry of summary judgment on all of Nardella's claims. (Doc. # 54). The Motion is ripe for review.

## II. **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260

(11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III. **Analysis**

    A.   **FLSA**

In Count I, Nardella alleges that Defendants violated the overtime provisions of the Fair Labor Standards Act (FLSA). (Doc. # 1 at 8-9). To succeed on her FLSA claim, Nardella "must demonstrate that (1) [] she worked overtime without compensation and (2) [Defendants] knew or should have known of the overtime work." Allen v. Bd. of Pub. Educ. for Bibb Cty., 495 F.3d 1306, 1314-15 (11th Cir. 2007).

Defendants argue this claim fails because their "payroll records establish that [Nardella] was paid for all time she reported." (Doc. # 54 at 8). According to Defendants, Nardella "offers no proof of inaccuracy" and "[a]lthough she claims that she was not paid for time entered into the timekeeping system for a few days during a period in which she was paid on an hourly basis, that contention is belied by the payroll records which show that she was paid large amounts of overtime in the pay periods in which those days allegedly occurred on time she submitted to iBS." (Id.).

In response, Nardella argues that she was not paid for off-the-clock work she performed while an hourly employee. (Doc. # 59 at 11; Doc. # 59-2 at 2; Doc. # 54-31 at 36:23-37:4). Specifically, she avers she "worked an average of seven

18

and one-half (7.5) overtime hours per week [] as an hourly, non-exempt employee from January 4, 2016, through October 29, 2017, and again, from October 13, 2018, through April 2, 2019, for which [she] was deprived overtime compensation." (Doc. # 59-2 at 2). Nardella provides no explanation why she did not enter these off-the-clock hours into the iSolved system while she was Human Resources and Compliance Manager with administrator access to iSolved.

Nardella's evidence creates a genuine issue of material fact regarding whether she worked off-the-clock hours for which she was not paid. She avers she worked overtime hours every week but there are certain weeks while Nardella was an hourly employee that she was not paid any overtime. (Doc. # 59-2 at 2; Doc. # 54-6). While Nardella was certainly paid large amounts of overtime for many weeks, Atlantic and Kitchner's paying overtime for those weeks does not establish that Nardella was paid for all overtime hours she worked. See Watts v. Silverton Mortg. Specialists, Inc., 378 F. Supp. 3d 1164, 1175 (N.D. Ga. 2019)("However, the fact that on some occasions Plaintiff reported (or was allowed to report) overtime, and was paid for it, does not defeat her claim that there were other hours that she worked that she was not allowed to report and was not paid for.").

19

Furthermore, the Court is mindful that "[i]n this circuit, in an FLSA action, an employee need not support their testimony with time records or other documentation." Long v. Alorica, Inc., No. CIV.A. 11-00476-KD-C, 2012 WL 4820493, at *6 (S.D. Ala. Oct. 10, 2012). While Nardella's failure to explain why she did not enter her off-the-clock work into the iSolved system while she had administrator access goes to her credibility, such credibility determinations are the province of the jury. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Atlantic and Kitchner have raised no argument regarding whether they knew or should have known that Nardella worked off-the-clock hours. Thus, there is no challenge at this juncture to this element of Nardella's FLSA claim. It is appropriate for Nardella's FLSA claim — to the extent it is premised on a failure to pay off-the-clock hours worked — to proceed to trial.

Next, Nardella disputes that iBS hardcoded the payroll data after it was submitted. (Doc. # 59-2 at 2). She also

20

testified that all "upper management" at Atlantic, including other employees in addition to herself, "had access to the timekeeping system." (Doc. # 54-14 at 63:4-64:5). Thus, she avers, other Atlantic employees and Kitchner "could alter or modify data therein to manipulate time records and payroll for which [she] was undercompensated and subject to unlawful deductions." (Doc. # 59-2 at 2). Yet, Nardella has produced no evidence that any employee of Atlantic or Kitchner actually modified the hours Nardella entered in the iSolved system. Nardella's conclusory and speculative allegations, unsupported by any factual detail, could not lead a reasonable jury to conclude that Defendants altered her reported hours in the iSolved system. See Barnett v. Athens Reg'l Med. Ctr. Inc., 550 F. App'x 711, 713 (11th Cir. 2013)("[I]nferences based on speculation and conjecture are not reasonable.").

Finally, Nardella's argument regarding alleged deductions to her salary while she was a salaried exempt employee is unpersuasive. (Doc. # 59 at 2, 15). Nardella contends that Defendants violated the FLSA because, "during [her] tenure as a salaried, exempt employee of Defendants, [they] made unlawful deductions from [her] salaried, exempt compensation from October 30, 2017, through October 12, 2018." (Id. at 2). Yet, Nardella does not challenge her

classification as an exempt employee during this time period; thus, Nardella has not challenged that she was exempt from the overtime provisions of the FLSA. Indeed, Nardella concedes that "[a]n employee whose terms and conditions of employment render [her] exempt need not be paid for all hours worked over forty (40) hours per week." (Id. at 15)(citing Kuchinskas v. Broward Cty., 840 F. Supp. 1548, 1553 (S.D. Fla. 1993), aff'd, 86 F.3d 1168 (11th Cir. 1996), and aff'd, 519 U.S. 1148 (1997)).

Nardella cites no authority establishing her entitlement to overtime compensation under the FLSA for alleged deductions made to her salary while she was a salaried exempt employee. She also provides no legal authority on whether such deductions would forfeit her exempt status. Significantly, Nardella's FLSA claim in her complaint is pled only as an overtime compensation claim. (Doc. # 1 at 8-9). Thus, her failure to challenge her status as an exempt employee from October 30, 2017, to October 12, 2018, or to otherwise support the applicability of the FLSA's overtime provisions to her during this time, precludes her from asserting an FLSA overtime claim as to her pay while salaried.

Regardless, the payroll records reflect that Nardella was paid her full salary — $1,923.08 gross pay — in every pay

period for which she was a salaried employee. (Doc. # 54-6 at 50-75). While Nardella conclusorily states that "unlawful" deductions were made to her salary and identifies eight pay periods in which such deductions were allegedly made (Doc. # 59 at 15 n.3), she never identifies specific deductions or explains how any of those deductions violated any laws.

In any event, Atlantic and Kitchner have thoroughly explained these deductions: one "deduction" was a retroactive adjustment for Social Security or Medicare payments required by law, and most other "deductions" in the remaining pay periods were for use of PTO for a full one or full-two-day absence. (Doc. # 61 at 9; Doc. # 54-6 at 56, 58, 59, 61, 64-67). A deduction of PTO for full-day absences is lawful. (Doc. # 61 at 10); see also 29 C.F.R. § 602(b)(2). The final pay period identified by Nardella was one in which she was hourly — not salaried. (Doc. # 54-6 at 49). Thus, even if Nardella could somehow use deductions as a basis for seeking overtime compensation while a salaried exempt employer, she has not shown a genuine issue of material fact about unlawful deductions.

In short, summary judgment is denied as to Nardella's FLSA claim because there is a genuine issue of material fact regarding whether Nardella was denied overtime pay for off-

23

the-clock work while she was an hourly non-exempt employee. However, Nardella may not continue to proceed on the theories that she is owed any overtime compensation while she was a salaried exempt employee or that Defendants modified the payroll records to reduce the number of overtime hours Nardella reported in the iSolved system.

**B.   FMLA Interference**

In Count II, Nardella asserts a claim for FMLA interference. (Doc. # 1 at 10-11).

"To establish an FMLA interference claim an employee must demonstrate by a preponderance of the evidence that he was denied a benefit to which he was entitled." Bradley v. Army Fleet Support, LLC, 54 F. Supp. 3d 1272, 1277 (M.D. Ala. 2014)(citing Pereda v. Brookdale Senior Living Communities, 666 F.3d 1269, 1274 (11th Cir. 2012)). "Benefits under the FMLA include both taking leave and being reinstated following a leave period, subject to certain conditions." Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 592 (11th Cir. 2017). "With respect to an employee's right to take FMLA leave, unlawful employer interference includes not only refusing to authorize FMLA leave, but also 'discouraging an employee from using such leave.'" Id. (citation omitted). "In addition to showing interference, a plaintiff must show that

she has been prejudiced by the FMLA violation in some way."
Id. "An employee need not 'allege that his employer intended
to deny the right; the employer's motives are irrelevant.'"
Martin v. Brevard Cty. Pub. Sch., 543 F.3d 1261, 1267 (11th
Cir. 2008)(quoting Strickland v. Water Works and Sewer Bd.,
239 F.3d 1199, 1208 (11th Cir. 2001)).

According to Defendants, Nardella "has provided no proof
that she was not allowed to take all time needed for any
serious health condition she suffered or that she ever failed
to take whatever time was needed to care for her son." (Doc.
# 54 at 13). Additionally, they argue Nardella "was not
demoted and there is no temporal proximity between her actual
or attempted use of FMLA and her reclassification to hourly,
which occurred more than at least eleven months and six months
respectively after the use or attempt." (Id.).

Atlantic and Kitchner do not argue that Nardella was not
entitled to take FMLA leave for her and her son's illnesses.
Thus, the only issue for the FMLA interference claim is
whether a reasonable jury could conclude that Defendants
interfered with Nardella's use of FMLA leave. The answer to
that question is yes.

Nardella has presented evidence that she requested FMLA
paperwork from Kitchner but Kitchner refused to give her that

paperwork. (Doc. # 59-2 at 4; Doc. # 54-32 at 19). Nardella claims that "Kitchner began to voice her displeasure with [Nardella's] attendance due to her son's medical issues and attending time away from work, and instructed [Nardella] that her attendance was problematic." (Doc. # 54-32 at 19; Doc. # 54-14 at 113:3-114:6; Doc. # 59-2 at 3). Nardella also testified that Kitchner discouraged her from taking further FMLA leave by making threats about her employment. (Doc. # 54-31 at 26:16-25, 28:9-16).

Taking the facts in the light most favorable to Nardella, there is a genuine issue of material fact regarding whether Atlantic and Kitchner interfered with Nardella's use of FMLA leave. See Diamond, 677 F. App'x at 593 ("Here, Diamond has produced sufficient evidence for a reasonable jury to conclude that Hospice interfered with her FMLA rights by discouraging her from taking FMLA leave in order to care for her seriously ill parents. The clearest example of such discouragement is Chennault's April 8 email to Diamond, which stated, 'Your continued unpaid time away from the workplace compromises the quality of care we are able to provide as an organization.' A reasonable jury could interpret this statement as a warning that taking additional FMLA leave could put Diamond's job in jeopardy." (citation omitted)).

Therefore, the Court denies Defendants' Motion as to this claim.

### C.   **FMLA Retaliation**

In Count III, Nardella asserts an FMLA retaliation claim against both Defendants. (Doc. # 1 at 11-12).

"FMLA retaliation is distinct from FMLA interference in that to succeed on a FMLA retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Bradley, 54 F. Supp. 3d at 1282 (citing Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010)). "A retaliation claim, therefore, is different from an interference claim because an employee must show intent to retaliate." Id.; see also Rudy v. Walter Coke, Inc., 613 F. App'x 828, 830 (11th Cir. 2015)("To state a claim for FMLA retaliation, the plaintiff must show that the defendant intentionally discriminated against him because he engaged in statutorily protected activity.").

"Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, [courts] apply the burden shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green." Hurlbert v. St. Mary's Health Care Sys., Inc., 439

F.3d 1286, 1297 (11th Cir. 2006). "A plaintiff bringing an FMLA retaliation claim must show that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Bradley, 54 F. Supp. 3d at 1282. "To state a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) the adverse action was causally related to a protected activity." Id. "If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." Id.

Defendants raise the same arguments regarding FMLA retaliation as they did for the FMLA interference claim. (Doc. # 54 at 13). Specifically, Nardella "was not demoted and there is no temporal proximity between her actual or attempted use of FMLA and her reclassification to hourly, which occurred more than at least eleven months and six months respectively after the use or attempt." (Id.). Thus, Defendants appear to contend that Nardella has failed to establish an adverse employment action causally connected to a protected activity.

Nardella argues that her pay change to hourly was a demotion and thus satisfies the adverse employment action

element.[1] (Doc. # 59 at 20; Doc. # 59-2 at 4). But there is no evidence that Nardella's title or duties changed along with her redesignation as an hourly employee. And Nardella's hourly rate would result in higher pay than her salary, if she worked at least 40 hours per week. (Doc. # 54-2 at 2-3). The payroll records reflect — and Nardella admitted — that each paycheck Nardella received after being transitioned to hourly exceeded $1,923.08 in gross pay — her biweekly salary. (Doc. # 54-6 at 76-90; Doc. # 54-31 at 65:11-19).

However, although the transition to hourly was not a true demotion, Nardella has presented evidence that the change to hourly did materially alter "her compensation and the terms and conditions of employment." (Doc. # 59 at 20). "An employer's conduct falling short of [termination, failure to hire, or demotion] 'must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an

---

[1] Although Nardella maintains that she was terminated, she does not allege that the termination was in retaliation for her use of FMLA leave. Rather, she alleges she was terminated only for "objecting to filing of illegal and fraudulent workers' compensation claims and refusing to participate in an illegal and fraudulent audit." (Doc. # 54-32 at 20).

employee.'" <u>Blue v. Dunn Constr. Co.</u>, 453 F. App'x 881, 884 (11th Cir. 2011).

A reasonable jury could conclude that the change to hourly did materially alter Nardella's employment. Nardella maintains that the change resulted in "less flexibility with hours" and "required [her] to clock in and out even on days working out of the office or during after work hours." (Doc. # 59-2 at 4). Thus, for summary judgment purposes, Nardella has satisfied the adverse employment action element of her prima facie case.

Nardella has also met her burden as to causation. She argues that there was close temporal proximity between her last use or attempted use of FMLA leave in May 2018 and the change of her pay to hourly. (Doc. # 59 at 21; Doc. # 59-2 at 4). "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1298 (11th Cir. 2006)(<u>Brungart v. BellSouth Telecomms., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000)). "But 'temporal proximity, without more, must be very close' in order to satisfy the causation requirement." <u>Jones</u>

v. Gulf Coast Health Care of Delaware, LLC, 854 F.3d 1261, 1271–72 (11th Cir. 2017)(citation omitted).

Here, there were multiple months between the last requested FMLA use in May 2018 and Nardella's transition to hourly pay in October 2018.[2] (Doc. # 54-32 at 19; Doc. # 54-14 at 127:8-128:8; Doc. # 54-42). Therefore, the temporal proximity alone is insufficient to establish causation. See Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006)("We have previously held that, in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation.").

Nardella has, however, presented evidence suggesting that her change to hourly pay was a direct result of Nardella's use of leave. Specifically, Kitchner told Nardella that she was being changed to hourly pay because she "had abused [her] privileges as an exempt employee" (Doc. # 54-42), which a jury could interpret as meaning that Nardella took too much leave. Additionally, Nardella testified that

---

[2] In her answers to interrogatories, Nardella stated that her requests for FMLA occurred in 2017 for her own medical condition and from November 2017 through "approximately May 2018" for her son's medical condition. (Doc. # 54-32 at 19). Nardella has not identified any requests for FMLA leave made after May 2018.

sometimes when she would take leave to attend to doctor's appointments, Kitchner would "tell [Nardella] that she was going to take [her] off of salary and that it's a privilege to be on salary and because [Nardella] couldn't stay for another hour she was going to take [her] off." (Doc. # 54-31 at 28:9-14). Kitchner would say that "if this" — Nardella's taking leave — "continues she's going to have to re-evaluate [Nardella's] position in the company." (Id. at 28:15-16).

While Kitchner insists the change was not retaliatory (Doc. # 54-2 at 3), a reasonable jury could credit Nardella's testimony on this issue. Thus, there is a genuine issue of material fact as to causation, and Nardella has established her prima facie case of FMLA retaliation at the summary judgment stage.

Now, the burden shifts to Defendants to produce a legitimate, non-retaliatory reason for transitioning Kitchner to hourly pay. Bradley, 54 F. Supp. 3d at 1282. Yet, Defendants present no explanation for why Nardella was transitioned to hourly pay — they merely allege that the transition was not retaliatory. (Doc. # 54-2 at 3). Thus, Defendants have not met their burden of production and summary judgment on this claim is not appropriate.

D.   **Florida Whistleblower Act**

In Count IV of her complaint, Nardella pleads a claim for violation of the Florida Whistleblower Act ("FWA") against Atlantic only. (Doc. # 1 at 12-13). Nardella alleges that Atlantic terminated her employment because she objected to illegal practices "with regard to [Atlantic's] workers' compensation reporting obligations under Florida law." (Id. at 7). "Specifically, in direct violation of Section 448.107(2), Florida Statutes, and Florida Administrative Code, Section 69L-6.015, [Atlantic was] purposefully attempting to underreport and/or fraudulently report to [its] workers' compensation carrier, the actual and truthful identify and classification of subcontracted and unlicensed workers to avoid having to pay increased premiums for same." (Id.).

"The [FWA] protects employees who '[o]bjected to, or refused to participate in, any activity, policy or practice of the employer which is in violation of a law, rule, or regulation.'" Burns v. Medtronic, Inc., No. 8:15-cv-2330-T-17TBM, 2016 WL 3769369, at *5 (M.D. Fla. July 12, 2016)(quoting Fla. Stat. § 448.102(3)). "In order to raise a successful claim of retaliatory discharge under the FWA, a claimant must show that: (1) she engaged in statutorily

protected expression, (2) she suffered a materially adverse action of a type that would dissuade a reasonable employee from engaging in statutorily protected activity, and (3) there was some causal relation between the events." Luna v. Walgreen Co., 575 F. Supp. 2d 1326, 1343 n.13 (S.D. Fla. 2008), aff'd, 347 F. App'x 469 (11th Cir. 2009). "Actions brought pursuant to the FWA are analyzed under the same standard as a federal retaliation claim." Id. (citing Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000)).

Atlantic attacks only the first element of Nardella's FWA claim. Atlantic argues that summary judgment is appropriate because Nardella did not have an objectively reasonable belief that it was violating any law or regulation. (Doc. # 54 at 19). It contends that "the conduct observed by [a whistleblower] plaintiff must as a matter of law be a violation of a law or regulation." (Id.).

The Court is not convinced by Atlantic's last assertion. "When ruling on an issue of Florida law that the Florida Supreme Court has not spoken on, the federal courts are bound by the decisions of Florida's district courts of appeal." Burns, 2016 WL 3769369, at *5. "In Aery v. Wallace Lincoln-Mercury, LLC, [118 So. 3d 904, 916 (Fla. 4th DCA 2013),] the

34

Fourth District Court of Appeal held that a claim under [the Florida Whistleblower Act] only requires a *good faith, reasonable belief* by the employee that the actions of the employer violated the law."[3] Id. (emphasis original). "To show a plaintiff has a good faith belief, that belief must be objectively reasonable." Id. "The [C]ourt measures the objective reasonableness of an employee's belief against existing substantive law and, accordingly, charges the plaintiff with substantive knowledge of the law." Sherk v. Adesa Atlanta, LLC, 432 F. Supp. 2d 1358, 1370 (N.D. Ga. 2006).

Atlantic has presented no support for the position that an "objectively reasonable" belief must be a correct one. Thus, even if Atlantic violated no law or regulation, Nardella could have had an objectively reasonable belief that Atlantic's conduct violated the law. Still, Atlantic is correct that the objectively reasonable belief standard is a high one, given its reference to existing substantive law.

---

[3] In Kearns v. Farmer Acquisition, 157 So.3d 458, 465 (Fla. 2d DCA 2015), the Second District Court of Appeal opined in dicta that an actual violation was a necessary element of a plaintiff's prima facie case. Still, Aery remains the controlling law on the issue because the actual violation standard in Kearns *was discussed in dicta.*" Burns, 2016 WL 3769369, at *5 (emphasis original).

Now the Court will address the Rule Nardella alleges Atlantic violated. Because Nardella failed to specify which sections of Rule 69L-6.015 she alleges Atlantic violated, the Court must deduce which sections are relevant to this case. Rule 69L-6.015(1) provides that "[e]mployers must at all times maintain the records required by this rule and must produce the records when requested by the division pursuant to Section 440.107, F.S." Fla. Admin. Code r. 69L-6.015(1).

Regarding workers' compensation insurance, Rule 69L-6.015(9) requires employers to "maintain all workers' compensation insurance policies obtained by the employer or on the employer's behalf and all endorsements, declaration pages, certificates of workers' compensation insurance, notices of cancellation, notices of non-renewal, or notices of reinstatement of such policies" and to "maintain a valid certificate of election to be exempt issued under Section 440.05, F.S.," for any "employee or officer of a corporation [it claims] is exempt from the coverage requirements of the workers' compensation law." Fla. Admin. Code r. 69L-6.015(9). Additionally, Rule 69L-6.015(9) requires every "contractor" to "maintain evidence of workers' compensation insurance of every subcontractor and for every subcontractor that is a corporation or limited liability company that has an officer

or a member who elects to be exempt from the coverage requirements of the workers' compensation law the contractor shall maintain a valid certificate of election to be exempt issued to the officer or member under Section 440.05, F.S."
Id.

Regarding this Rule, Nardella cannot meet even the lower reasonable belief standard. Nardella maintains in her response and affidavit that she had a "good faith, reasonable belief that Defendant's [a]udit violated the law" because of Atlantic's "illegal recordkeeping and failure to maintain proper [COIs], exemptions or 1099s for the workers' compensation audit." (Doc. # 59 at 24; Doc. # 59-2 at 4). She relies on her March 29 and April 2 emails in which she notified Kitchner that she believed Atlantic was violating Rule 69L-6.015 and requested not to be involved in the audit. (Doc. # 54-26). She also notes her testimony that Wecht "was not retaining" COIs, 1099 forms, and exemptions for "any of [Atlantic's] subcontractors [and] workers." (Doc. # 54-14 at 137:6-24).

But it is clear that the relevant sections of Rule 69L-6.015 only relate to Atlantic's required maintenance of records related to, among other things, workers' compensation insurance. The Rule says nothing about what documents must be

turned over to a workers' compensation insurance auditor, as opposed to the Florida Department of Insurance.[4] Therefore, Nardella could not have reasonably believed that the failure to turn over certain documents to the auditor was a violation of Rule 69L-6.015 — the only rule or law that Nardella

---

[4] A separate statutory section, Section 440.381(3), Fla. Stat., requires that employers provide all records showing payments to employees, subcontractors, and independent contractors to the auditor to review. See Fla. Stat. § 440.381(3)("The Financial Services Commission, in consultation with the department, shall establish by rule minimum requirements for audits of payroll and classifications in order to ensure that the appropriate premium is charged for workers' compensation coverage. The rules shall ensure that audits performed by both carriers and employers are adequate to provide that all sources of payments to employees, subcontractors, and independent contractors have been reviewed and that the accuracy of classification of employees has been verified. . . . The annual audits required for construction classes shall consist of physical onsite audits. Payroll verification audit rules must include, but need not be limited to, the use of state and federal reports of employee income, payroll and other accounting records, certificates of insurance maintained by subcontractors, and duties of employees. . . ."). But Nardella never alleged in her complaint or elsewhere that Atlantic violated this statute. Thus, Nardella cannot base her claim on this statute. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); see also Bankston v. Sewon Am., Inc., No. 315CV00207TCBRGV, 2018 WL 1779451, at *11 n.25 (N.D. Ga. Jan. 31, 2018)(not permitting a plaintiff to allege a new adverse employment action in response to a motion for summary judgment because the additional adverse employment action was not pled in the complaint), adopted by, No. 3:15-CV-207-TCB, 2018 WL 1783167 (N.D. Ga. Mar. 9, 2018).

identified as being violated in her March 29 email and her complaint.[5]

Next, the Court must analyze whether Nardella could have had a reasonable, good faith belief that Atlantic had violated Rule 69L-6.015 simply by failing to retain the proper records — the actual requirement of Rule 69L-6.015. While she had testified that Atlantic, through Wecht, was not retaining any records for any subcontractors, Nardella could not identify the subcontractors for whom records were not retained. (Doc. # 54-14 at 137:6-24). Importantly, Nardella provides no further elaboration about why she thought Atlantic's recordkeeping violated the Rule. Her response cites no other testimony or evidence about why she believed 1099 forms or

---

[5] In her affidavit and response, Nardella states that she "identified Florida Administrative Code 69L-6.015, codified and implemented by §§ 440.05(10) ; 440.107(3), and §448.107 (2), Fla. Stat., as the legal authority violated by Defendants' illegal recordkeeping and failure to maintain proper Certificates of Insurance ('COIs'), exemptions or 1099s for the Audit." (Doc. # 59 at 13; Doc. # 59-2 at 4). But neither Nardella's March 29 email to Kitchner nor her complaint (Doc. # 1) identified Sections 440.05(10) or 440.107(3) as being violated by Atlantic's actions or as forming the basis of her FWA claim. Thus, she cannot use her response's reference to these statutes to amend her complaint. See Gilmour, 382 F.3d at 1315 ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

exemption forms were not maintained in compliance with the law.

The only specific record evidence before the Court relates to Nardella's disagreement with other Atlantic employees over the maintenance of COIs and whether they were turned over to the auditor. (Doc. # 54-26; Doc. # 54-8 at 6; Doc. # 54-47 at 63:11-64:18). And Nardella's belief that COIs had to be maintained for all vendors used by Atlantic — not just subcontractors and certain independent contractors — was not objectively reasonable. Florida law requires employers in the construction industry to maintain workers' compensation coverage for its employees, and defines "employee" as "[a]ll persons who are being paid by a construction contractor as a subcontractor, unless the subcontractor . . . has otherwise secured the payment of compensation coverage as a subcontractor." Fla. Stat. §§ 440.02(15)(c)(2), 440.10(1)(a). The term "employee" does not include "[a]n independent contractor who is not engaged in the construction industry." Fla. Stat. § 440.02(15)(d)(1).

Nardella's own March 29 email to Kitchner reveals that she was aware that Dunnam, the agent for Atlantic's workers' compensation carrier who "assist[ed] the company with inspections, premium audits and class code verifications

related to workers' compensation coverage," had said that COIs were not required for all vendors. (Doc. # 54-26; Doc. # 54-8 at 1-2, 6). And the auditor's own letter, which was sent to Nardella before she emailed Kitchner on March 29, only requested to see COIs for subcontractors — not all of Atlantic's vendors. (Doc. # 54-9).

Because Florida law did not require the maintenance of COIs for all vendors with whom Atlantic did business and Nardella had been informed that maintenance of all such COIs was not required, Nardella did not have an objectively reasonable belief that Atlantic was violating Rule 69L-6.015 by not retaining COIs for all vendors to turn over during the audit.

Finally, even interpreting Nardella's complaint liberally as alleging that Atlantic both (1) violated Rule 69L-6.015 and (2) committed fraud against the workers' compensation carrier during the audit, Nardella's claim fails. Nardella has not presented sufficient evidence to support that she had an objectively reasonable belief that Atlantic committed fraud on the workers' compensation insurance carrier during the audit. Again, Nardella was aware that Dunnam had concluded that COIs were not required for all vendors for the audit. And she admitted in her deposition

41

that hiding subcontractors' COIs from the auditor would only have resulted in Atlantic paying higher workers' compensation premiums. (Doc. # 54-31 at 82:12-20; Doc. # 54-8 at 4). Nardella also testified that she did not "have any evidence" or "any knowledge" that Atlantic "did not disclose all the amounts that were paid to subcontractors." (Doc. # 54-31 at 83:20-84:17). And Wecht testified that she did obtain all subcontractor COIs to give to the auditor. (Doc. # 54-48 at 56:8-57:24, 59:9-16). Therefore, Nardella could not have reasonably believed that Atlantic's alleged refusal to turn over all vendors' COIs or other documents to the workers' compensation auditor was fraud.

Nardella also has presented no evidence that anyone at Atlantic told the auditor that they had a COI for a subcontractor when they did not — a lie that would actually result in a reduction in workers' compensation premiums. (Doc. # 54-31 at 81:25-82:11). Thus, Nardella also could not have held an objectively reasonable belief that Atlantic was creating false records to present to the auditor to lower its workers' compensation insurance premiums.

In short, there is no genuine issue of material fact regarding whether Nardella had a good faith, reasonable belief that Atlantic had violated the Rule or otherwise

committed fraud on its workers' compensation insurance carrier. Thus, summary judgment for Atlantic is appropriate on this claim.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants Atlantic TNG, LLC and Megan Kitchner's Motion for Summary Judgment (Doc. # 54) is **GRANTED in part and DENIED in part.**

(2) Summary judgment is denied on Count I, Nardella's FLSA claim, and Counts II and III, Nardella's FMLA claims.

(3) Summary judgment is granted on Count IV, Nardella's Florida Whistleblower Act claim.

(4) As Nardella's FLSA and FMLA claims will proceed to trial, the Court will not enter judgment under Federal Rule of Civil Procedure 54(b) on the whistleblower claim at this time.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 11th day of May, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE